UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------x

23-CV-8968(TAM)

ROY WRENN, et al.,

Plaintiffs,

- versus -

CITY OF NEW YORK, et al.,

Defendants.

------------------------------x

United States Courthouse
Brooklyn, New York

June 9, 2026
10:00 a.m.

TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE HEARING
BEFORE THE HONORABLE TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES

Attorney for Plaintiff: HACH ROSE SCHIRRIPA & REHNS LLP
112 Madison Avenue
Suite 10th Floor
New York, New York 10116
BY: FRANK R. SCHIRRIPA, ESQ.
JOHN BAYLET, ESQ.

Attorney for Defendant: City of New York
NEW YORK CITY LAW DEPARTMENT
100 Church Street
New York, New York 10007-2601
BY: ALEXANDRA CORSI, ESQ.

Attorney for Intervenor: Kings County District Attorney's Office
KINGS COUNTY DISTRICT ATTORNEY'S OFFICE
Civil Litigation Unit
350 Jay Street
Brooklyn, New York 11201
BY: JOHN CARROLL, ESQ.
ZACHARY SIDER, ESQ.

APPEARANCES (CONTINUED)

Also Present: JERRY BOWENS, PRO SE
(Appearing Telephonically)

Transcription Service: LINDA D. DANELCZYK, RPR, CSR, CCR
Phone: (201)452-5143
Email: LindaDan226@gmail.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

(In open court.)

THE COURTROOM DEPUTY: This is a civil cause for discovery conference in case 23-CV-8968, Wrenn, et al. versus City of New York, et al.

Will the parties please state their appearances for the record, starting with the plaintiff.

MR. SCHIRRIPA: Good morning, Your Honor. Frank Schirripa, Hach Rose Schirripa & Rehns, for plaintiff and the class.

MR. BAYLET: John Baylet from Hach Rose Schirripa & Rehns for plaintiff and the putative class.

THE COURT: All right. Good morning.

And for the City?

MS. CORSI: Good morning, Your Honor. Alexandra Corsi from the Office of the Corporation Counsel.

THE COURT: Good morning.

And for the Kings County District Attorney's Office?

MR. CARROLL: Good morning, Your Honor. John Carroll. I'm the chief of civil litigation of the Kings County District Attorney's Office.

THE COURT: Okay.

MR. SIDER: And assistant attorney, Zachary Sider, from the Kings County District Attorney's Office.

THE COURT: All right.

So good morning to everybody.

We're here today concerning this motion to compel that the plaintiffs filed seeking to take discovery concerning the exonerees in this case, as everyone is familiar. And I welcome, you know, argument as to whatever you would like to say in support of your motion, Mr. Schirripa.

But one of the things I'd like to try to focus on with both sides is the practical realities of what is it -- what is in these files? Do they exist? And what are you looking to get from them?

Because one of the concerns about this case, it's a complicated question, a little bit of a chicken-and-egg issue, as to whether or not there have been constitutional violations with regards to some of the exonerees.

The determination with, you know, the Kings County District Attorney's Office to vacate these peoples' conviction was not based on the finding of misconduct as to each situation.

Do you agree with me there, Mr. Schirripa?

UNIDENTIFIED SPEAKER: Hello?

THE COURT: Oh, hello, is somebody on the line?

UNIDENTIFIED SPEAKER: Okay, I reached out to you weeks ago.

THE COURT: Oh, okay.

Are you calling from a facility?

UNIDENTIFIED SPEAKER: Yes, exactly.

THE COURT: Okay, thank you.

UNIDENTIFIED SPEAKER: Okay. You're welcome.

THE COURT: I wonder if Mr. Kacamakovic is outside waiting out there?

Maybe -- should we go look for him?

MS. CORSI: Do you want me to go check?

THE COURT: Mr. Bowens, are you here?

MR. BOWENS: Yes, I'm here.

THE COURT: All right, sir.

So I just -- we just started the conference. People stated their appearances, and I asked my first question, which I will repeat momentarily.

This is Judge Merkl. Here in the courtroom we have Mr. Schirripa and Mr. Baylet, the plaintiffs' counsel; Ms. Corsi from the City of New York is out in the hall looking for Defendant Kacamakovic; and from the Kings County DA, we have Mr. Sider and Mr. Carroll.

And I note now that Mr. Bowens is here representing himself pro se.

Is that correct, sir?

MR. BOWENS: Yes.

THE COURT: Okay. All right, I'm going to turn up the volume.

All right.

(Pause in the proceedings.)

THE COURT: Okay, well, his attendance was optional, the way my scheduling order was written. So if he is here, hopefully he makes it into the courtroom.

I think the scheduling order was clear. It's also on the public calendar as to where we are. So hopefully, if he's here, he arrives; but if not, thank you for looking for him.

MS. CORSI: No problem.

THE COURT: All right.

So, Mr. Bowens, I had asked my first question, sort of started to frame the issues for today.

And what I'd like to focus on, with respect to these issues, and I'd like both sides to be thinking about this, is kind of our -- part of our through line, if you will, is the practical realities of the discovery you're seeking and why.

You know, what does plaintiff anticipate will be in these files that -- and how it is -- the discovery of them, to the extent they exist and they can be produced, is proportional to the needs of the case.

And my question to the City and to the Kings County DA will touch upon similar things in terms of the practical realities of what exists. Some of these files are very old. I have no idea whether they exist. I don't know if they know yet.

And I just want to understand the burden, the

practical realities, the proportionality, and most fundamentally, what you're looking for, Mr. Schirripa?

Because as I understand the allegations in the complaint, the Kings County District Attorney's Office has not made a specific finding as to each of the exonerees that there was wrongdoing in their case.

Do you agree with me on that?

MR. SCHIRRIPA: That's what the press release states.

The press release states -- and we believe, plaintiffs' side, that this was a bit of a white wash statement that was superfluous, didn't need to exist in the statement. There's obviously now about 378 exonerees, and what were the facts that went into that.

So clearly there was a review done on these files. These were not the only perpetrators that were arrested by these 14 officers. So it wasn't a flat-out exoneration of every arrest that they made in this period of time.

There were facts that went into the consideration by the Conviction Review Unit. And we believe -- well, defendants have yet to really move to dis -- they haven't moved to dismiss the second amended complaint on the basis of the underlying constitutional violation. It's this larger *Monell* claim.

And indeed, we don't believe that we have to

necessarily delve into each instance of the facts of the violation, the policy, the practice, and what has come about in our allegations.

What we believe we'll find in discovery, that this was a practice used by the Brooklyn South Narcotics Group, and these particular officers. Jason Arbeeny, Police Officer Jason Arbeeny testified to this in his trial that he was, in fact, faced with quotas and planted evidence. And this was what the ultimate exoneration was premised upon.

So while defendants have yet to really delve into the underlying constitutional violations they've made -- you know, these thinly failed threats in various pleadings and papers in this case; you know, in the motion to strike; in the motion to dismiss; certainly in a Rule 11 letter, they've attempted to delve into what happened in two of the plaintiffs, Gibson and Wrenn, their arrests.

We believe if those issues do come to the forefront, whether at class certification stage or summary judgment, we're going to need this discovery at that stage.

THE COURT: But what is in the files?

They have the file for your named client?

Do you have the file for Gibson?

MR. SCHIRRIPA: We have the file for Gibson.

THE COURT: What's in it?

MR. SCHIRRIPA: His arrest records, and I believe

the conviction, the plea.

THE COURT: Okay. And what else?

Like his rap sheet? Like what do you mean by "arrest record"? Is the on-the-formal complaint form? Like what literally?

I'm literally asking --

MR. SCHIRRIPA: Right.

THE COURT: -- what discovery you have and what you're seeking as to each of these defendants.

MR. SCHIRRIPA: Well, we'd like to know what was the basis for the arrest, and what they found. And then ultimately the plea arrangement, the plea deal.

So that information we would need to know for each of them. Because, obviously, many of them took a plea to, you know, move on with this process. So ultimately that's what we'd like to see.

We believe the dispute here that we raised originally, and we were brought before Your Honor from Judge Donnelly, was with the premise of, you know, early discovery and trying to reach -- if we could reach a resolution in this case.

So in order to do that, we said let's meet with the magistrate judge, Your Honor, and try to obtain some discovery.

One of the key things it would tell how much time

was served on each person. We have the names. We have the indictment numbers. We need to know how much time was served.

And that's an issue that's come up -- there's another case, another class case set with the Southern District, Rosina Feliciano versus City of New York. It's 24-CV-7212.

And in that case there, both sides, the Kings County District Attorney's Office -- by the Manhattan District Attorney's Office, the Bronx District Attorney's Office, and the City, along with plaintiffs' counsel, all recognize that 160.50 can be waived. The Court has the authority to do that, and these documents can be produced and given over to plaintiffs' counsel to effectuate, you know, further settlement discussions.

So initially that's how we were assigned to Your Honor.

THE COURT: No, you were just assigned to me in general.

MR. SCHIRRIPA: In our initial conference with Judge Donnelly, it was: Let's try to see where we can go with this case, and we need to get discovery to proceed to the next steps.

So in order for us to do that, we believe --

THE COURT: But you still haven't answered my question.

What literally is in the Kings County box?

MR. SCHIRRIPA: Certainly time served and what the underlying -- what the underlying charge was, what they have --

THE COURT: You can start with the time sentenced.

MR. SCHIRRIPA: Time sentenced. And ultimately served. That they did serve time.

THE COURT: Not clear in the prosecutorial files they have the time served. Depends.

MR. SCHIRRIPA: Okay. Time sentenced certainly will, you know, be a key factor for each of the 378 exonerees.

And I think that's something that can be relatively found. We're not talking about digging up, you know, tons of boxes of documents.

I mean, there's been arguments made by Kings County District Attorney's Office that, you know, how many man hours or the personnel hours, sorry, that were -- would be entailed in searching through these documents and how limited their resources and staff are.

We're certainly not looking to create work. We're a plaintiff's firm, we have to operate efficiently.

THE COURT: I mean I've heard from them, in terms of their burden, but why do you -- why do you take the position that this isn't going to be onerous? What do you know about their file storage system?

MR. SCHIRRIPA: What do I know about their file storage system?

THE COURT: Yes.

MR. SCHIRRIPA: I did work in the Kings County District Attorney's Office --

THE COURT: So tell me...

MR. SCHIRRIPA: -- years ago.

You know, 20 years ago it was a bit antiquated, paper files. So I will take their word for that. I do not believe that it's gotten much better, but certainly my technological skills are not where they should be.

THE COURT: If it is a paper system, and we'll hear from them, it seems like looking up files for 378 people would be extremely onerous.

MR. SCHIRRIPA: Yes, except for the fact that these 378 people were single -- were isolated, found, and there was a review done for this.

We didn't -- the City did not -- Mr. Gonzalez and his DA's office did not pull these names out of a hat.

So there has to be some paper trail, at least with respect to these people.

THE COURT: The paper trail may well involve a lot work product, and that is, of course, a question that I have for the Kings County DA's attorneys.

But in terms of the actual underlying files in the

City, what are you looking for, beyond the DA's Office, for each exoneree?

MR. SCHIRRIPA: Well, putting aside work product privilege, obviously the determinations that were made and what factors played into each exoneree's determination.

THE COURT: Well, that sounds like work product.

MR. SCHIRRIPA: Understood, but that's --

THE COURT: You don't get that.

MR. SCHIRRIPA: Well --

THE COURT: It's a discretionary call made by a United States District Attorney for who knows how many reasons. I don't see how you're entitled to his determination process.

Do you have authority for that?

MR. SCHIRRIPA: I can get back to you. Not off the top of my head. I don't want to miscite something.

THE COURT: Okay. That's all right.

MR. SCHIRRIPA: It's our view that there was more to this than just picking names randomly out of a hat.

THE COURT: I don't disagree.

The question is, and I'm not trying to be obtuse here, like, quite literally, what documents do you think the Kings County District Attorney's Office, and the City, including the police, maintain that are not subject to privilege, that are discoverable, to help you advance the

discovery and the understanding of the claims in the case? I really am looking for practical answers.

Because saying like turn over the files is meaningless. And I'm certainly going to ask the Kings County DA, and maybe they shred some light on what would be in a sample file.

MR. SCHIRRIPA: Well, I think --

THE COURT: But that's why I was asking with Gibson.

What did you get? Literally. What did you get when you got his file?

MR. SCHIRRIPA: He had (indiscernible).

Your Honor, we have the arrest record. We have disposition. And then the (indiscernible).

THE COURT: Okay.

MR. SCHIRRIPA: And other than that, we're trying to, in many ways, guessing at what could be in these files.

THE COURT: All right.

And were any of the police records maintained as part of the Kings County DA file?

Like was -- did you get like -- you were saying earlier the basis for arrest, for example. And that would be like in the original complaint form, or maybe even in a memo book. But like...

MR. SCHIRRIPA: I think there is the original complaint from the written complaint form in there as well.

THE COURT: Okay, Mr. Baylet looks like he wants to say something --

MR. BAYLET: Yes, Your Honor.

THE COURT: -- to you or to me. I'm not sure but...

MR. BAYLET: Yes, Your Honor, I appreciate it.

We have not received any discovery yet from the Kings County District Attorney's Office. So we don't know exactly what their files is. We just received what the City had regarding the prosecution files and --

THE COURT: Okay.

MR. BAYLET: -- and as made clear in our response, and it was not the full file.

THE COURT: Okay. Thank you.

All right. And anything else you would like to add in terms of what you did receive so far as to Mr. Gibson?

MR. BAYLET: It was mostly limited to the police, NYPD's side of things.

THE COURT: Okay.

So I'm going to stop for a few minutes, Mr. Schirripa, and I'm going to turn to Ms. Corsi.

So, Ms. Corsi and, you know, Mr. Carroll, obviously I have your papers.

What I'm really trying to understand is what may exist with regard to these folks, and what would be the process of looking into it, the production.

And also, you know, I understand your argument that this is -- I understand your legal arguments, but you -- there is ample authority that in certain circumstances the Court may (indiscernible) 160.50 provide some discovery considering there had to have been a sampling to start. You know, figuring something out that would be proportional to the needs of the case. But it's really hard to do that without knowing the practical realities of what exists on the ground.

So starting with you, Ms. Corsi, what does the police department, if you know, maintain with regards to files such as this, and what was the origin of the Gibson documents?

MS. CORSI: Sure.

May I remain seated, Your Honor?

THE COURT: Yes, absolutely.

MS. CORSI: So I mean I think, you know, in -- generally in cases like this, it would be the arrest report, the complaint report. If there was any evidence vouchered, it would be vouchers. It could be the LLPA, which I forget what it stands for right now, but that usually tells us how much time the individual was in custody for, once -- you know, from arrest to arraignment.

Those are generally, you know, the police -- the police records. If there was, for example, drugs recovered, if they were field tested, if they were lab tested, any reports such as those.

The issue is that these documents, because everything dates back to, you know, over -- some can be over two decades old, not everything is necessarily computerized.

So that is going to be a big issue is trying to retrieve those -- find the files, the documents, if they are in paper format. You know, retrieving them from different commands, for example.

If they are computerized, of course, it's a bit easier, but we're not -- we won't know that until we are actually searching for them to find out when each individual was, for example, arrested.

I don't know when the system, you know, potentially changed over for everything to be computerized. But, you know -- so it is going to be a time consuming process. And, again, I think as I noted in our papers, you know, we have limited staff who is able to do that from the NYPD.

And so, you know, that's going to be a very time consuming task for the NYPD to then come over -- you know, to give us many of the documents and then go through them and then produce them.

Granted there probably wouldn't be many redactions to those documents, but -- because, you know, when we include work product or whatnot.

THE COURT: -- witness names.

MS. CORSI: Sure.

So I would still need to, obviously, review the documents and prepare them for production.

So, you know, this can be -- if there were 378 individual arrests, I mean months and months to gather those documents. I can't even approximate how long it would necessarily take, but it could not be turned around in no way in 60 days.

As Your Honor's aware, you know, in general in our cases when we have a single case, you know, we ask for 60 days to try to look into stuff in one case. So if this is times 378, it's going to take significantly longer.

THE COURT: Can I ask a question?

Do you know what your office did with regard to the mass protest cases? Like how they managed that discovery?

MS. CORSI: I do not know that. I apologize. We don't know that offhand.

And I think just --

THE COURT: I just saw Mr. Sadiki (phonetic) this morning.

MS. CORSI: I just saw him as well.

THE COURT: Mr. Sadiki used to be in their office.

How did you guys organize all that? Because those are the kind of tips and tricks that could be helpful in terms of -- as well with a reset, so everything is digitized.

MS. CORSI: Exactly.

And I think actually that, as I was reviewing my papers, I think that was part of the position that we may have explained in our papers.

But I do think, and I tried to actually find out more about the Feliciano case that Mr. Schirripa had mentioned, because I know they are talking about settling the case.

And I -- you know, I was trying to figure out what route they are going, because I know that they are not collecting documents from everybody in that case, yet they are still on tract to -- to settle the case, and I was trying to see what, you know, if we can kind of parallel that, potentially.

But I know what our office's position is, you know, as I've explained before, in general, I think it would be much easier, regardless of the, you know, 160.50 issues and all those privacy issues, it would be best to start with a sampling versus the entirety of them to see if that sampling is going to glean the information that plaintiff is looking for. And see if it then would be worth or necessary to even go down the route of getting even more documents for more individuals.

THE COURT: So here's a practical question in terms of the way that the New York sealing law operates.

So if I were to find, hypothetically speaking, of

course, that it would be appropriate to invade the 160.50 privacy and permit the retrieval and disclosure of the arrest records for these folks, where and how, if at all, could we glean, you know, the counts of conviction, and who served what amount of time?

MS. CORSI: Sure.

I think -- I'll let the District Attorney's Office speak about their files specifically, but I mean I think the criminal court files are really where we would find what were the charges that they were convicted on, and what they were actually sentenced to.

Then as far as serving time, that gets more complicated because, you know, we would likely have to reach out to the New York City Department of Correction to see their records, as far as how much time, you know, an individual may have spent in custody with them in relation to that arrest and conviction, potentially.

But if it was a felony conviction, then, you know, chances are the individual was then sent upstate, and then those become New York state records, and that is not, you know, where the city versus the state, so that is a whole separate, you know, agency we have to deal with.

And --

THE COURT: Those records, I think, are digitized, though, the New York state docs records.

MS. CORSI: I'm sure --

THE COURT: Even going back a ways.

MS. CORSI: Okay.

But I know, just in my experience, because I've handled several of these cases, it does take time in an individual case to get records from them.

And, you know, I've -- it's changed from case to case, sometimes they accept a 160.50, sometimes they require a subpoena. So, you know, that -- it does get complicated in trying to obtain records from them.

And I do also know that now that these cases are sealed, you cannot -- you can't just look them up online and find out, which you can, generally, when there is a convicted individual and find out, you know, their history, as far as how long they spent in custody.

THE COURT: Yes. It's actually one of the things that I always found remarkable, back in my days as a prosecutor. New York state sealing law actually works.

Like the stuff is gone. Like you can't find it, you know, as opposed to the federal system, where there's no way to seal anything. Like literally. There's no mechanism for it, to effectively seal for all of time the way there is in New York state. And so this issue of getting the records is actually fairly complicated.

All right, so continue. Anything -- so New York

state records might be necessary, New York city docs records --

MS. CORSI: Yes.

THE COURT: -- and the court file and what else?

MS. CORSI: I mean I think -- and I'm sorry, this -- if you could, just because I lost my train of thought, what was the original question?

THE COURT: The original question was if I were to say, hypothetically speaking, or I determine that a 160.50 waiver was appropriate for purposes of (indiscernible) discovery, of course providing the information to everybody in confidence under a confidentiality order, where would we need to look for the records?

MS. CORSI: Sure.

THE COURT: And what exists? I mean, that was really the import of the question.

MS. CORSI: Yeah, yeah, yeah.

So I think, you know -- as I explained all of those, the state agencies or New York state Department of Correction, the City Department of Correction, I think the criminal court file. And then it would be, you know, the police department, some police department records.

I mean, the arrest reports to determine what are the arrest charges. And, again, like I said, you know, to the extent information, evidence is vouchered, vouchers and any

subsequent testing.

So I mean it comes from a variety of places. And then, of course, the district attorney file, which I will need to, my colleagues over here, to do stuff.

THE COURT: Okay.

And here's another question. And I'll ask both sides -- both of you.

The memo books. Those are not preserved in the ordinary place file in the ordinary course; are they?

MS. CORSI: I mean -- historically. I know they've moved to digital memo books. Yeah, back in the day like, correct. Yeah.

And that, I do believe -- I don't know exactly what the police department's policy was when somebody is either terminated or retired. I do believe they -- I don't want to speak out of turn, because I'm not sure if they actually take them with them, or if the police department ends up retaining them.

THE COURT: Candidly, I'm not certain that there was a clear policy. Because I got different answers all the time.

I mean I used to do historical cold cases in the organized crime context, and it would be like, oh, I left all those in my locker 20 years ago.

I mean...

MS. CORSI: Yeah.

THE COURT: You know, versus, oh, yeah, they're in my garage.

You know, like it was -- the answers were always variable.

MS. CORSI: Yeah.

THE COURT: So I don't know.

I mean, without a police department document historian here, I don't know that we would ever find out the answer to that.

MS. CORSI: Yeah, I agree.

And certainly at that time they were definitely all on paper. Because it's only been in the last couple of years that everything has been digitized.

THE COURT: Yes, it's recent.

MS. CORSI: Yeah, very recent, I think.

THE COURT: Mr. Carroll, do you know when the memo books went digital?

MR. CARROLL: I do not, Your Honor.

THE COURT: Oh, I'm sorry, you're the chief of civil litigation.

MR. CARROLL: I'm the chief of civil litigation.

THE COURT: That's what the DAs would know, or the ADAs, the prosecutors would know, because it's a different discovery requirement for them at this point, so...

All right, so, Mr. Carroll, you know, obviously,

you've been listening to the whole thing, I have your papers.

You know, I think that there is a lot of case law to support the notion that there will need to be some, you know, probing of some of these confidential files, but the thing that we were really struggling with in trying to write our, you know, decision is what exists and how it would work and what is the burden on the various producing parties, and is there a way to come up with appropriate sampling? It's complicated by the fact that there are multiple officers involved.

So I'll look back to you, Mr. Schirripa, for your thoughts on samplings. Of course, you raised it as well.

But from your perspective, Mr. Carroll, you know, what is your reaction to Mr. Schirripa's requests as to the Kings County District Attorney's Office? What product and content, maybe it's not work product, I don't know.

Is there any light you can shed on the process by which the determination was made, this exoneration, and what files exist as a result?

MR. CARROLL: Can I stand, Your Honor? I have a hard time speaking sitting.

THE COURT: That's okay. Either way. Just make sure the microphone is like pointing up, if you're standing.

MR. CARROLL: Thank you.

So thank you, Your Honor.

Yeah, if I could just -- I definitely want to answer your question, but if I could just step back to the sealing question.

I understand there is -- there's definitely precedent that somewhat allows the Court to override CPL 160.50.

We, of course, view to CPL 160.50 as a very important sealing section, as you stated. New York is one of the sealing statutes that really works and protects people who have been exonerated from, you know, having this stuff come out.

And the case law dealing with kind of mass unsealing, a good example cited in this case is with the mass kind of protest arrests.

THE COURT: Uh-huh.

MR. CARROLL: I think that is really distinguishable from the situation like that -- from the situation like this.

The -- in that case, the people who were arrested, were arrested for mostly minor crimes. They were protesting something that most of the country was kind on port with these protests.

The idea -- and so the idea that it would seriously hurt their reputation to not ask their permission before their cases were unsealed, now that was understandable.

In this case, we're talking about 378 cases. I

think 70-something of them are felonies. They were mostly drug cases. These are -- you know, these are serious felonies and serious crimes. And these people think, you know, that this is behind them and sealed.

And they may be working jobs, you know, where -- and this is supposed to -- the sealing statute is supposed to exist to, you know, make it as if this never happened. And to just bring this up without asking their permission in this case.

It's also, based on this kind of situation, it's not as if all 378 of these people were found actually innocent. This was a situation where there was a blanket dismissal because we didn't -- and I'll go more into depth how we -- my understanding of how we came to these determinations.

But based on the fact that we didn't trust these officers any more, so we couldn't be sure of their convictions. But they weren't found actually innocent.

So basically, I could foresee a situation, this comes out and now these -- and now this group of people, who thought this was behind them, if it comes out that, you know, their conviction is suddenly unsealed, and maybe they are one of the group.

There's probably people in this -- in the 378, there are some who are guilty and were lucky enough to just, you know, they got arrested by an officer who, you know, we no

longer trusted them. You know, maybe they were guilty of something, but not something as serious as they were arrested and convicted for.

And then are some who were actually innocent. And I could absolutely see someone who's actually innocent, who is -- has a job and things like that, and now suddenly they're in this group of just mass exonerees, not for actual innocence, and they're going to be painted with that brush.

And so I do think that this is a distinguishable situation, and I think the plaintiffs in this case, they know who most of these -- these people were represented by Legal Aid and BDS. That's Brooklyn Defender Services for the record.

And so they could contact their attorneys and send a form letter and say, can you send this to your former clients? And if they're interested in being involved in this case, call us up and -- you know, because that's the great thing about 160.50. The person themselves, if they're on board, can always consent to the unsealing of their case.

And so -- I mean, I would first ask that that happen in this case, that the plaintiffs actually contact the defense attorneys and see if they can get the permission.

And then once we have the permission, then we can narrow it down to that group of people who actually give their permission to -- you know, to be involved in this case.

Now, as to your question with regard to what files. It depends on whether they are felony files or misdemeanor files. My understanding is that there are 70 so -- 70 or so felonies.

MR. SIDER: Seventy-nine, 80.

MR. CARROLL: Yeah, 79 or 80. And that means that there are around, you know, close to 300 misdemeanors, and 79 or 80 felonies.

Felony cases often are -- sometimes they're one bankers box filled with records of thousands of pages of records. Sometimes they're multiple bankers boxes. Misdemeanors are often smaller, but, you know, it still might have hundreds of pages.

Because what we have is, we usually have most, if not all, depending on how far along the case has gotten, of the NYPD paperwork. That often includes copies of the memo books. Not always.

If there was a plea very early on, it's possible we hadn't received that yet. But eventually we're supposed to receive all of the police paperwork. So there are copies of that.

Then there's all the DA paperwork as well. They're also supposed to -- if there are any emails sent, they're supposed to -- you know, we often perform email searches when we're asked to get all the documents for a case.

If there are any emails sent by ADAs between each other, you know, with -- inside of the DA's Office or to, you know, the police or other agencies that we need to get documents from. Depending -- you know, again if it's a drug case, we're going to have laboratory results and things like that from the NYPD.

We often -- we sometimes don't have the plea minutes. That's often a court record. Sometimes we do, but often what winds up happening is the case is over and so -- so they don't always order the file -- order, you know, the transcript afterwards.

So the actual transcripts may actually not even be in our possession, they'd be in the court's possession.

THE COURT: Do we know, based on the review that the District Attorney's Office did, whether these cases principally involved pleas or whether there were any trials?

MR. CARROLL: I'm not sure about that.

I spoke to -- what do you call it -- the deputy chief of our Conviction Review Unit, and he kind of laid out the general process.

And my understanding is that they searched -- and, again, I really want to stress that I think plaintiffs' attorney should -- should try to contact these people and get their permission before we unseal anything.

And this would include these documents. Because we

not only seal all the physical documents, but also all our computer records.

And until we have an order, we, you know, our -- our IT department, with the exception of people who are -- and this is an agreement we made with the defense bar. There are some people who are called "gatekeepers" who can look at the basic facts of the case, you know, but only supposed to do it for legal purposes, just to make sure that there actually is a case or something like that.

But for the most part -- but to actually get any -- go any more in depth, our policies are -- our internal policies are the HR department does not unseal the case until the -- we get an order or a waiver from a former criminal defendant, which we then send to them, and then they unseal it within our internal system.

My understanding is that these exonerations mostly happen by our CRU unit. We have something called the Case Management System, which has basically like -- has screening sheets and some very basic information.

Basically what's on the screening sheet, but it will also have if someone pled guilty or was convicted, what they were convicted of or pled guilty to and what the sentence was.

As Ms. Corsi said, we wouldn't have actually how much time they served, we'd have to go to the Department of Corrections for that.

My understanding is that was mainly how they made the determination. They looked at those basic facts. Occasionally he said that they might have delved a little deeper, but they didn't -- as far as he knew, they didn't keep specific track of which ones they delved deeper into.

But for the most part, they looked at those basic facts, which are in the screening sheet, and if they felt this officer's -- one of these officers, if their testimony was essential to -- then that's what, you know, led to a decision about exoneration.

On the other hand, if they just happened to be involved but, you know, there were, you know, other officers who could testify or did testify, you know, based on -- based on this information, you can see which officers were kind of the principals and who were maybe just on the periphery.

And so if they were the principal and they saw the illegal acts in question, and so any -- any trial would have been dependent on their testimony, that's up -- that is my understanding.

I didn't do this review process, so I -- I'm going based on hearsay, obviously.

But I -- that's my understanding of how the process was -- how they made the determination about who would be exonerated and who wouldn't. So I mean we look at these basic facts.

Now as to the time, even just pulling up everything on -- you know, getting the unsealing order, getting our IT department to unseal everything, and then pulling up the stuff on case management for 378 cases, my staff, you know -- Mr. Sider is actually going to leave us in two days. I congratulate him. He's got a job at a civil firm. And I am getting a new attorney on Monday, but he's going to obviously have to be brought up to speed.

And then we have seven paralegals. We are -- we get, you know, a bigger workload, my understanding, then all the other DA's offices, which is understandable, Kings County is the largest county in New York state. That Brooklyn is it's own city.

The rest of the City would still be the biggest, followed by LA, followed by San Francisco, and then Brooklyn would be the fourth largest city in America.

And so it's -- we already get thousands of -- my nine-person staff, essentially; two lawyers and some paralegals, already handle thousands of FOIL requests, agency requests, and subpoenas every year on various cases. And so even just pulling up this basic information would take months for all 378 cases.

But to actually turn over everything we normally turn over, when it's a wrongful conviction case, with one file, to put it in perspective, we had a case actually with

Judge Henry, right across the way, the Freeman case, and that's still going on.

That was a case with nine boxes. I mean there's a lot more discovery besides this, but nine boxes of files, as well as emails and digital records. And that took us, to just do those nine boxes and emails and all that other stuff, took us nine months. About a month a box.

And so in this case, if the felonies were even just one box each. So that's 79, 80 felonies, and the misdemeanors, you know, even if you said five of them could fit in one box, you know, they were files, you know, where, you know, that would still be 50 more boxes for the 200 misdemeanors.

So we're talking about 130 boxes. You know, something like that. Plus email searches and things like -- so if it's a month a box, you can kind of do the math and see you're looking at about a decade to actually turn over everything.

So it would be -- I mean that's actually why the -- the standard is would it be unduly burdensome and would it threaten the normal business operations of the office. This would cripple the normal business operations.

In fact, I don't want to get too personal here, but my mother-in-law, sadly, passed away on -- not this past weekend but the weekend before, the funeral was yesterday, I'm

technically on bereavement leave.

THE COURT: I'm sorry.

MR. CARROLL: Thank you.

But I said, it's my wife, I'm going to go back home telling the kids after this, but I said, I have to come in just for this morning, because literally this would be -- I mean I would be tough for the DA later if we suddenly had to turn over over a hundred boxes and, you know, ten years' worth of stuff. I mean it would -- it would just be such a crippling workload. It would really -- it would -- it would be unfeasible.

And so that's why just it's so important for me to be here.

THE COURT: All right.

And it is correct, sir, that the Kings County District Attorney's Office file as to Mr. Gibson has not yet been turned over; is that correct? The main plaintiff.

MR. SIDER: So typically -- I'm sorry, Your Honor. So typically I guess if the City turned over the file. But likely what typically happens is that we receive an agency request, it's pretty much a FOIL request from the City. So we'll turn over to the City the file as the agency request, and the City will turn it over to plaintiffs' counsel.

I don't know if that's happened in this case?

MR. SCHIRRIPA: No.

MS. CORSI: Yeah, I produced --

MR. SIDER: She doesn't have like a prosecution file, any of the prosecution paperwork, and a lot of time the police paperwork comes from the DA's Office to the City and the City gives it to plaintiff's counsel.

And if plaintiff's counsel sees that, you know -- plaintiff's counsel or a prosecutor looks at file and says there is more paperwork than what the City gave us, it's not uncommon for them to subpoena the file as well, if they believe there are other documents.

Because the burden, a FOIL for holding records, and a subpoena, because subpoenas require privilege logs, where FOIL just requires a letter saying documents withheld for a specific reason. So it's not uncommon for both to happen.

But if we turn over an agency request and they turn it over to plaintiff's counsel and plaintiff's counsel has -- all they would get pursuant to a typical FOIL request.

MR. CARROLL: And, Your Honor, just -- just to clarify, we don't usually, when we get an agency request from the City, we treat it like a FOIL arrest, but we generally don't turn over a letter to the City.

If the City has any questions about things have been withheld, we -- we -- we'll let them know.

But generally that will have work product taken out, rap sheets taken out. Obviously if it's a felony or a grand

jury, stuff will be taken out, because we can't even share that with the City without a court order.

Because even though, obviously there's -- there are *Monell* claims on the federal level, which has created kind of a legal fiction that the City is -- that the City is responsible for certain aspects of what happens in the DA's Office, we're actually separate, the DA's Office is not part the --

THE COURT: Very aware. Yes, there's the distinction, obviously.

MR. CARROLL: Yes.

THE COURT: So, Mr. Schirripa, part of what I'm struggling with here is, back to the question I asked at the outset, in terms of what you're actually looking for in the files, right?

Because I would be shocked if one of the cops, you know, had a note in a memo book: Planted drugs on this fellow. This never -- you're never going to find that, right?

So given that that is never going to be in these files, how does getting all of this paperwork advance a cause, from your perspective, as opposed to getting some through other, you know, basic information, I guess is the real question.

Is there a way to get some basic information that will help you to -- if I decide the 160.50 should be

penetrated, and that's still subject to discussion, but if I were to make that decision, how would this advance the cause?

MR. SCHIRRIPA: Okay. So let me answer that question, then I'd like to respond to my adversary's 160.50 argument.

What I did hear from them is that their CRU team has screenshots, basic info. This is what this review is done on.

So ultimately what we are calling a "white wash review" is a summarily review of a computer screen and some information where -- I mean, the press release says, well, this was an essential witness, and because this essential witness has been compromised by other acts and other acts include testifying, I understand that I fabricated evidence, I put in false complaints and filed false documents with respect to arrests, which are clearly on point, they decided to exonerate 378.

THE COURT: But there was precedence. But that doesn't mean these folks are innocent. I mean --

MR. SCHIRRIPA: This is the same --

THE COURT: -- and it doesn't mean that those folks planted drugs. We don't know.

MR. SCHIRRIPA: This is the sixth largest mass exoneration in United States history, okay.

THE COURT: That's not evidentiary.

MR. SCHIRRIPA: No, no, I get that.

But they're complaining now that this is so burdensome to do this review, how did we do the review last time? What did they review last time?

So we heard about ten years' worth of documents reviewed. And I understand the appeal that we need more staff, and maybe that's an appeal to the government or the mayor that they need more people working in the DA's Office, but they ultimately --

THE COURT: You don't understand my question. My question is what is actually in these files that you need to advance your cause?

Because you're never going to find the smoking gun. It's not going to happen. I think we can all agree on that, right?

MR. SCHIRRIPA: Well, could we start with -- so sampling. This idea on sampling that Ms. Corsi has addressed.

We've turned over a list of the indictment numbers and the complaint numbers. That was over a year ago.

How many of those have been digitized? She believes some have been.

THE COURT: She can't even check without the determination on the 160.50.

So answer my question. What in these files actually advances your cause? What data points?

MR. SCHIRRIPA: I would think the screenshots or

screen sheets that they're referring to you and the basic info that they considered during the mass exoneration, which if we can't get to until we make a determination -- the Court makes a determination on the 160.50, that sounds to me like it is a digital document. Very easily searchable. And we can get into sampling, if necessary. But I didn't hear anything there.

And this was a basic search. It was what was done at the time of the exoneration. I would start with that.

I would think perhaps there's something there that advances our -- because that's what was used in the determination of who was going to be exonerated.

THE COURT: Mr. Carroll, if the 160.50 waiver were placed by me, or if you get one from one of the putative plaintiffs, what does the burden look like to pulling that case management sheet that you described?

MR. CARROLL: Thank you, Your Honor.

The -- I think the burden there -- I mean if it's still, just because the vast size, if we did it all for 378, I think it would still take a few months to go through it all to pull them all out.

But that would obviously be a lot smaller than actually going through all the case -- the actual case files.

And, unfortunately, the digitization, while some of our files have been digitized, most of all of the files have

not.

And, unfortunately, it's actually created a little bit of a -- it's actually created more work, unfortunately, even with regard to the newer files, because we still have physical things, but then we also have digital.

And so in doing our due diligence, and if we've done a request for everything -- everything involved in the case, they actually are having to search the physical and the digital.

And so, unfortunately, right now the digitization process has actually created more work.

THE COURT: Oh, it's everywhere. Everywhere where people physically do work, and that also worked on the computer, I mean, attorneys go to court.

MR. CARROLL: Exactly.

And so it's --

THE COURT: There's a lot of paper involved.

MR. CARROLL: Yeah.

And so I think, at least with regard to -- I mean, if we get a sample of just the -- a few cases and just the screening sheet, it's called a screening sheet or -- and that's usually -- that information, as well as the witness information and -- and, like I said, the -- what they were convicted of and what they were sentenced -- and what their sentence was, it's usually on our case management, as long as

the case isn't too old.

But that's usually -- if it was only a few cases, sampling a few cases and just that information, that would be relatively easy. We could probably get that in -- you know, if we said, okay, ten cases and just that information, we could probably get that in 30 days or less.

But if it was for all 378, that would probably take a few months. And like I said, the whole files for all 378 would take many years. And so that's basically the -- how long it would take.

THE COURT: So the -- you describe the screening sheet. Is that part of the case management?

MR. CARROLL: Yeah, the -- yeah.

MR. SIDER: So how it works is, we have a Case Management System, which is the internal database, it lists information.

THE COURT: Sorry, somebody's speaking, Mr. Bowens.

MR. BOWENS: Jerry Bowens.

The officer said I only have 30 minutes. We've been an hour. I will try to give another five minutes, Your Honor, but we have to go.

THE COURT: Okay. Did you want to weigh in on anything that's been discussed so far, sir, if you have to maybe hang up?

MR. BOWENS: Actually will say one thing, Your

Honor. Making sure (indiscernible).

THE COURT: Well, Mr. Bowens, I'm afraid -- sir, I'm sorry, you're breaking up a little bit anyway.

Take care.

MR. BOWENS: A couple more minutes.

THE COURT: So what were you trying to say, sir?

Mr. Bowens, did you say you have to go?

MR. BOWENS: For like five more minutes (indiscernible).

THE COURT: Okay, I couldn't understand everything that you just said, because the phone was kind of breaking up. If you could just slow down and speak a little more clearly and slowly, I think it would help with the speakers in the courtroom.

MR. BOWENS: Okay, I will (indiscernible).

I mean Mr. Wrenn, who had -- so we stated that he was selling drugs and -- when he was arrested by me, and that's all I want to say (indiscernible).

THE COURT: I understand your argument, sir, and I do have those written submissions that you filed on ECF. So thank you for listening patiently.

Is there anything else you want to say before they take your phone privileges away?

MR. BOWENS: Your Honor, just (indiscernible).

THE COURT: I'm sorry, we didn't catch that.

MR. BOWENS: I said I'll keep listening maybe another minute or two, but I really have to go.

THE COURT: Okay, I understand.

But thank you for letting me know and sharing your thoughts on the flawed nature of the process.

As you know, I started with that as part of the premise, which is there's a little bit of a chicken-and-an-egg issue in this case, in terms of whether there are constitutional violations and/or whether or not there's a policy and practice that created an unconstitutional set of enforcement situations and trying to figure out what discovery is proportional, in light of the totality of the circumstances, including the District Attorney's Office's determination to exonerate everybody, it's complicated.

But thank you for being here, Mr. Bowens.

MR. BOWENS: Thank you very much.

THE COURT: All right. Thanks.

All right. So, Mr. Sider, you were going to tell me a little bit more about how the Case Management System is organized and just what those documents are called.

MR. SIDER: Yes, so the case management is organized, like an internal database that is searchable. So maybe searched by a docket number. Unless the case is sealed, it will either have no data return, or it will say the indictment number, and it will say "sealed" across everything

so you can't get any information.

But if it's an unsealed case, it might tell us information like the assigned ADA, the sentencing, if there was a plea, if a trial. It would then say the sentencing.

And then it would allow you go to individual documents, if it was updated. If was like an older case in the 2000s, it might just say basic information. And you try to look it up and it says a screen sheet, and it will just give you an error message.

The screen sheet is a separate document. It's done by our ECAB unit. So it's the Early Case Assessment Bureau.

And in that situation, typically a police officer calls the -- an ADA that's been assigned to screen the case. And it will give you like the basic facts. Facts information. They'll do the charges. The witnesses. If it's a police case, all the police officers, and information -- basic information like that. If there's a witness statement.

So that gives us a very basic information, but it won't tell you anything beyond like a pre-arraignment.

MR. CARROLL: Again, I mean the screening sheet is a document created during the ECAB stage, primarily for the arraignment ADA so that they have basic facts of the case, so they can tell it to the judge during the -- you know, during -- you know, when they're making their bail application and things like that. The -- so it is a separate document.

The information from the screening sheet is typically on -- when you go into case management, put in an indictment number, the case will come up, if it's not sealed, and you'll be able to see the basic information about the assigned ADAs, the basic, you know, the -- yeah, the basic -- you know, again, if they took a plea, what it was to, what their sentence was.

And then it will have the information from the screening sheet in there on the rest of the case management. Generally if it's updated.

There will a way to click on a button that will then actually show you the screening sheet that was made by the Early Case Assessment Bureau for arraignments.

And, yeah, basically what it will have, it will have the time, place and occurrence. The arrest time and date -- the arrest time and date. The arresting officers and the other officers who were -- they knew about being involved in the ECAB, and whether they were interviewed. And then a narrative portion kind of telling you what happened.

The -- I'll also point out the -- on the Case Management System, you will also often be able to click on a button that will then bring up the original criminal court complaint, which is the original accusatory instrument that will also contain, you know, the basic facts of what happened. And it will also -- it will also tell you -- that information

will also tell you, because it's often from either the point of view of the arresting officer.

And he'll be speaking, or she'll be speaking, you know, either from what they saw themselves, or if they learned stuff from other officers, it will say the deponent, who's the person who's signing the accusatory instrument, is informed by this officer that this thing happened. That, again, was necessary to make out all the charges for everything that was -- that was charged. And then we later have to get corroborating affidavits from the officer.

But in that -- that's why I think, based on my conversation with CRU, this was predominantly what they used, because you can tell from this information, you know, the basic facts of what happened. Like what time, because again -- you know, in that screening sheet they're going to have the basic facts, as usually told by the arresting officer. And you also have the basic facts making out the elements of the crime in the accusatory -- in the initial accusatory instrument. So you can kind of tell what happened, you know, from these basic documents.

And so, like I said, they did say to me, although they didn't -- it was actually Deputy Bureau Chief Eric Sonnenschein who I spoke to and (indiscernible) spoke to, I believe, and -- or contacted. I mean, we may have emailed back and forth. I can't remember if we spoke. It was a

little while ago.

But the -- but I think what he said was that they basically looked at the screening sheets in case management, maybe the accusatory instruments, and that in some of the cases they may have gone a little bit deeper. But they didn't really keep a record of what cases they went deeper into.

And so that's -- so that's the basic information that's on the -- the case management.

And as I said, if it was only a sample, giving that very basic information, that initial page that comes up when the case is unsealed, maybe the screening sheet and the -- and the accusatory instrument for a sampling of cases, that would not be a particularly heavy lift, if those were -- if Your Honor -- again, you know our position with regard to the sealing, but if you go beyond that, then that would mean -- I think we can get that, like I said, 30 days, once we get the order and it's unsealed in our system.

For all 378, now that would -- that would take a few months, at least.

And, obviously, if we went deeper and got all the paperwork we have, that would take years. And we wouldn't even necessarily have everything, if the plaintiff is looking for, you know, things like plea allocutions. That stuff you would have to go to the -- I mean generally we don't -- we will turn that over if ordered by the court, of course. If we

have it. We often don't have it.

We generally, if not ordered by the court, we don't even like -- we have kind of an agreement with the court reporters, because we're kind of undercutting them. Usually, you know, they ask us, you know --

THE COURT: To order the transcript.

MR. CARROLL: Yeah, yeah, but ask the -- yeah, to ask the person to order the transcripts, rather than, you know, just giving it to them.

And so -- so, yeah, that's -- so obviously it would be an enormous lift, if we have to turn over everything.

But I hope that answers your questions.

THE COURT: No, that's very helpful.

All right, so, Mr. Schirripa, obviously you wanted an opportunity to also be heard with regard to the 160.50 issue, and I'm not trying to cut -- thwart your opportunity to respond to anything that they just said regarding the file management, but, you know, I -- I really -- you know, you had seemed to suggest that perhaps the basic, you know, data could be sufficient, at least initially.

You know what -- I just am fully trying to understand how you think you can prove the pattern and practice or the constitutional violations as to each individual, based upon sort of the routine records and where also be looking for evidence?

MR. SCHIRRIPA: Well, obviously there's not going to be, you know, a flat out admission in the police records that we planted evidence on this person.

So I think that really comes to the full nature of the case, right, and the matter of this was investigated, there were ultimately a policy and practice by the police department, which was recognized in Judge Donnelly's decision, in our allegations -- regarding allegations and possibly dealing with the motion to dismiss.

The issue that I think what we're hearing now is that this was -- and, you know, something that the Kings County District Attorney's Office and the City would like to pretend didn't happen, right? So we're talking about sealing records and what -- let's just call it a "delay". These 378 people, they've moved on with their life and, hey, we're just going to erase your records. And --

THE COURT: It's the operation of law. It's not a question of their decision, it's a state law.

MR. SCHIRRIPA: Understood. Understood.

However, they're attempting to use the state law to prevent us from learning information about these people in their benefit. I'm not trying to --

THE COURT: Well, in your judgment that it's to their benefit. How do you know?

MR. SCHIRRIPA: True. However, past precedent would

allow us to obtain these documents in connection with our allegations in our claim. We've argued that in our motion.

The City has clearly agreed to this in this other Feliciano case, which also has to do with an exoneration of the names of defendants.

THE COURT: What did they agree to in Feliciano? Do you know?

MR. SCHIRRIPA: They agreed to waive -- not be bound by the statutory requirements of 160.50, and 160.50(5) in the following cases.

There's an attached rider with 40 names and indictment numbers where the City, the District Attorney's Offices of both the Bronx and Manhattan are agreeing to turn over certain records.

Yesterday there was a joint status report filed in that case where it was agreed upon that there's a proposal for a four-bucket allocation of certain documents that would be turned over.

I would ask if we could work with our adversaries to figure out what these four buckets are, because obviously this is something that someone else from within Corporation Counsel has looked at and determined what was accessible in the same type of exoneration case.

So we're not, you know, shooting at the -- in the dark here.

Again, it's my understanding that this was a cursory review, from what Mr. Carroll is saying, of a screen sheet. I believe this can be produced relatively easily. It's certainly -- it's within our realm --

THE COURT: If you are alarmed of the fact that that there's people knocking on the 13th floor window, that would be justified. They've been cleaning the windows for like a couple of weeks now.

MR. SCHIRRIPA: -- clean your windows. Our windows, we can't see through.

THE COURT: I mean, they appeared outside my window upstairs, and I was like, whoa, they're here on the 14th floor. So, yeah, they're right there. They're banging on the building.

Okay, sorry. Don't mean to -- I saw Mr. Baylet looking concerned.

MR. BAYLET: Your Honor, I was a little bit.

I have copies of the unsealing orders from that case.

THE COURT: I'd love to see it. I'd love to see, you know, sort of creative approaches to the extent --

MR. BAYLET: So one --

THE COURT: -- that determined 160.50 --

MR. BAYLET: I'm sorry.

THE COURT: That's okay. Go ahead.

MR. BAYLET: One was filed by plaintiff. One was filed by the City. And then a second one was filed by the City as well, I believe, the CO of operations.

THE COURT: Okay.

All right.

MS. CORSI: Your Honor, I may just add a little something to this.

I -- as I said before, I was trying to find out today kind of the -- before today, or before the conference, kind of more of the details of what's going on in that case.

But I think the other -- you know, the difference here, too, is that is two other District Attorney's Offices. So I don't know how they maintain their records.

And that case is also -- while it is similar, it is different, because that involves one individual police officer. I believe it is with Scarcella (phonetic), correct, is that? Yeah, I believe so. And I am happy to find out more information from my office about kind of the details.

But I do know there was some sort of bucket -- conversation about buckets of information. I was trying to find out what that meant, and this was kind of for the purpose of trying to (indiscernible) that's okay -- to try to resolve the case.

If I recall correctly, and I don't want to be -- and, again, I don't know for sure, but I don't think that they

were -- I'm not sure that, whether this is even relevant at this point, but when they were talking about settlement, whether they were even going by, you know, time people spent in custody, because I think they were not getting that information.

I think it was -- there was some way they were resolving this that I don't think they were going to have to get all of the information and it was going to be like a blanket kind of agreement that some people were going to be lucky and they may have spent a year in jail, and they were -- or maybe not so lucky and they were going to get X amount, and some people who only spent two days in jail were going to get lucky because they were going to get the same amount as that person who spent a year.

So like I said, I don't know the full details, but that was kind of my understanding a week or two ago when I spoke to the attorney who's handling it.

THE COURT: Well, it would certainly be helpful to hear if there are creative approaches that, you know, could help to kind of cut through the complexities of all this.

We can discuss (indiscernible) sort of the case in terms of the depth of the misconduct, along with maybe (indiscernible). Like there's hard to imagine like three cops with the worst history in the City, then just those three, at least in my judgment.

MR. SCHIRRIPA: I believe, Your Honor, this was New York City Police Department Detective Joseph Franco.

THE COURT: Oh, it was Franco.

Because I thought Scarcella --

MS. CORSI: Yeah.

(Indiscernible).

THE COURT: Okay, okay.

I'm less familiar with Franco, I'm more familiar with Scarcella, because he was here in Brooklyn.

So, you know, the 160.50. I've certainly read the cases, expand on anything you'd like to say in response to Mr. Carroll's argument. We keep distracting you.

MR. SCHIRRIPA: That's fine. I think we've addressed it fully in our papers, but certainly it's -- can be waived by the City. And has been.

THE COURT: No, I don't think it can be waived by the City without a court order, right?

MR. SCHIRRIPA: Yes. The City can stipulate to allowing an agreement on that, and the Court can enter an order.

THE COURT: Okay.

MR. SCHIRRIPA: And they have in the past.

MR. CARROLL: Your Honor, it's also -- maybe -- we don't know how the relationship between the City and the DA's office is in that case, but I mean we're -- we're -- at this

point, I mean we're having opposing -- I don't know their discussions --

MR. SCHIRRIPA: They did as well.

MR. CARROLL: -- oppose them --

They may have consented, at the other end, including our DA's office may have consented to an order.

But in this case, we're obviously in opposition.

And there's a reason for that.

I don't know what kind of relationship they have with these 40 -- these 40 former defendants. I don't know if there was any, you know, communications with them. I don't know anything about those cases.

I just know -- and this is also a lot more than 40. This is 370 something.

THE COURT: Right.

MR. CARROLL: And I don't know if there's been any -- you know, I don't think -- who knows if -- you know, there's also, you know, I think we need to know more facts about it as well.

And, you know, I don't even know -- and like, for instance, I don't know how many in this case are still alive. I don't know how many in that case are still alive, and so it's like -- there are a lot of facts that I just don't know about that, those 40.

And so with this -- with these 370 something, we are

opposing. There should be at least an attempt to try to reach out to these people. And I'm sure some of them -- you know, with such a large group, some of them do not -- would not want to be involved, and would not want this -- you know, their records unsealed. Some of them might. And if they did, then we would certainly -- they could waive 160.50.

THE COURT: So I was --

MR. SCHIRRIPA: Do we now how many were waived?

THE COURT: I actually am about to ask him that exact question.

Mr. Schirripa, have you made any efforts --

MR. SCHIRRIPA: We --

THE COURT: -- to reach out to folks?

MR. SCHIRRIPA: Yes.

So when we started the case, we did a mailing. We had names, addresses, last known addresses, and we did send a mailing out.

We have not had any opposition or anyone said we don't -- please don't contact us.

We did not ask for 160.50s from every person. This was back when we started the case.

THE COURT: Okay. And so you -- did you get a kind of mail return?

MR. SCHIRRIPA: Yes.

THE COURT: Okay.

MR. SCHIRRIPA: Yes.

THE COURT: So the addresses you have are not current for a group of them?

MR. SCHIRRIPA: We have multiple addresses for each person. And I have an entire bankers box full of letters that came back either returned or (indiscernible) obviously.

THE COURT: All right.

So if you do have a list, would there be a down side to trying to see how many of them want to affirmatively opt in or out?

Because there are serious privacy issues, which is why the New York state sealing statute is what it is.

You know, how is it appropriate for me to say, regardless of what's going on in your life right now, these people you don't know, and have not authorized to represent you, can read your files that are now confidential by operation of law.

MR. SCHIRRIPA: Understood, Your Honor.

It's our view, and from the case law that we've read and cited in our brief, that we're entitled to get those documents.

THE COURT: Entitlement is a different question. I don't think you're entitled. I think the case law permits you --

MR. SCHIRRIPA: Yes, yes.

THE COURT: -- a determination. But I don't think it is an entitlement.

MR. SCHIRRIPA: Not an entitlement. I misspoke. It permits us to obtain that information in connection with furthering these plaintiffs' claims as absentee class members.

THE COURT: What does that have anything to do with it?

MR. SCHIRRIPA: They can opt out.

If we provide them notice that we've gotten past class certification, they can opt out of the case. They can pursue this individually. Or ignore it.

THE COURT: Is there any risk their information become public over the course of the case?

MR. SCHIRRIPA: Absolutely not. There obviously will be a protective order, as there is in every case that we are involved in.

We would file every name, their personally information under seal, and never expose that outside of this courtroom what they are.

And we can keep that, you know, for attorney eyes' only. You know, the highest, strictest protections that any court order, protection order or confidentiality order would provide for.

THE COURT: So with those, you know, procedures in place, Mr. Carroll, what is your response, in terms of why

there would be a privacy issue?

MR. CARROLL: Well, first of all, I think -- I mean, there are two issues. I don't doubt that everyone will try their best to keep everything private. But there are always -- there are always issues that someone's things leak out.

And I'm not saying we will do that intentionally, absolutely I'm not putting that out there at all. But just the nature of things, that things will leak out.

It's also the fact that they -- you know, they may want this completely sealed from everybody, and that includes us. You know, and it includes everyone involved in this -- in this process.

So I -- so I do -- and that's why I think the sealing -- the sealing statute is there.

I also think the fact that plaintiffs' counsel has in fact been able to reach out to some of these people, and we talked to the idea of maybe a sampling, maybe that might be -- you know, they reach out to the people who they did get a response from, and to the extent those -- some of those people are willing to unseal, then we can turn over the case manage -- you know, the initial things that CRU looked at, the case management, the screen sheets, things like that on those cases.

That might be a way to protect privacy law at the

same time, not create an onerous amount of, you know, work that makes it almost impossible for us to operate. And plaintiffs' counsel gets information that they need with regard to those cases.

I would also just ask, I know that they sent out -- that plaintiffs' counsel sent out letters to addresses that they know.

Has there been any attempt to contact their former attorneys? You know, sending something to Legal Aid, BES, who represented -- my understanding, represented a majority, the vast majority is my understanding of these -- of these -- you know, of these former defendants. And they might have more information about how to contact -- contact them, their former clients.

MR. SCHIRRIPA: I believe so. An attorney in our office was in contact with the Legal Aid and the Brooklyn Defenders Office. I can check back and see if any further inquiry was made there. If there was any contact there.

But what I am hearing is, if I was to obtain 378 160.50s, it would still take them ten years to produce the documents to me.

THE COURT: Well, the full file.

MR. SCHIRRIPA: Now, it's my understanding if I had the 160.50 --

THE COURT: They wouldn't necessarily -- I wouldn't

necessarily determine that that's proportional to the needs of the case.

However, the 160.50 does not compel them to do anything.

MR. SCHIRRIPA: Right. And I'm not asking for bankers boxes worth of files. It really -- the issue that we're trying to get to is, you know, obviously the charge, the conviction, and time served.

And, you know, we started the conference, this hearing this morning with that, Your Honor. I'm certainly back to -- I think those are fairly discrete, simple information. I'm hearing that there's a -- you know, database management system that was reviewed at some point in connection with this generation.

I think everything we're asking for is relatively accessible. We've reviewed millions of pages of documents in other class cases. It's something that we do. I understand that we're equipped and staffed differently. But this does not seem out of the realm of feasible.

And I would entertain a discussion with Your Honor or with Ms. Corsi regarding sampling. There are 13 -- 13 police officers -- well, is it 13 or 14?

MR. BAYLET: It is 14, 13 police officers at issue.

MR. SCHIRRIPA: I mean I think we can probably, you know, pick through and see how that plays out with some sort

of sampling.

But I'm not trying to make this more onerous than it needs to be, and ultimately it's our view, obviously, that this discovery is necessary for any resolution of the case, whether it's settlement or, you know, otherwise.

So we try to do that.

THE COURT: All right.

Ms. Corsi?

MS. CORSI: Thank you.

I just wanted to add, I think I'm -- Mr. Carroll's argument, the first half of it on just the privacy issue, too, because just to add, I think, you know, even if there was a strict attorney eyes' only confidentiality stip, that really doesn't limit the viewing of the documents to just the people that are in this courtroom.

You know, for us to be able to get those documents, it's going to require numerous police officers to pull the documents. And, you know, they're going to have their eyes on them. Then I think people in your office, who are going to have to be pulling the files. And, you know, I'm sure it's -- you know, it's the files are in archives. It's going to be whoever is pulling files from archives.

You know, I'm not saying that people are sitting there reading them but, you know, it's not just simple that an attorney eyes' only stipulation is going to, you know, keep

the five of us and the Court to be the only people accessing the information.

And just, you know, it -- you know, not -- I think if any one of us sitting here today was -- if we were that criminal defendant, and we have no idea that this is happening, and knew that there were all these people looking at information that maybe I was frankly embarrassed about or, you know, didn't want revealed, and, you know, that -- I think that is something that should be considered. It is these people's lives, and it's information that's personal to them.

And if they have received a letter that says we're proceeding this litigation and they haven't responded, that might mean they are not interested in having their information disseminated to anyone.

THE COURT: I'm also, you know, concerned about how we could locate everybody if there is -- if and when there is ever a class in the case, that's a whole separate problem that we'll have to deal with, if and when the time comes.

MS. CORSI: If I may just add one more thing.

I think, you know, the other issue is, frankly, I don't even know how the names have been accessible. Because that alone should have -- should currently be sealed.

Like, you know, they provided me a list, but I don't -- I don't understand how the list is actually even created with all that information, because it should, in fact,

be sealed.

THE COURT: Mr. Schirripa, remind me where -- I remember there being something about the list as part of the original exoneration.

Remind me where you got it?

MR. SCHIRRIPA: I believe we got the list -- I have to check that. I don't want to misspeak as to where the list came from originally.

If it was part of the original exoneration and -- it wouldn't have been publically (indiscernible) or if indictment numbers, or if it was a collection of communicate -- you know, conversations with the defense counsel.

THE COURT: I see. Okay.

I think technically, the defense counsel probably should not have disclosed that. I don't think the 160.50 puts a bar on the First Amendment.

MR. CARROLL: I completely forgot about (indiscernible) is right.

In fact, most of these cases, because of their age, will be in archives and actually will be -- you know, the files themselves will be handled -- we'll have to ask someone from DORIS, who's the Department of Records for the City, to pull a lot of these files, actually.

So it would not just many people who are in my office who would be looking at them, you know, in order to

process them, but it would also -- it would even -- it would require us to contact the Department of Records and their employees.

It wouldn't necessarily be looking through them, but they'd see the outside of them and that all has information.

THE COURT: Do you know the retention policy?

MR. CARROLL: The retention policy -- yeah, I think it's -- I think it's 25 years for misdemeanors. I don't think they destroy felonies.

So I think felonies are -- you know, we keep them as far back as I -- we -- yeah, I pulled felony files when I was an appeals person from '80s, '90s, and even occasionally it's come up as litigation, but rarely.

But for motions to vacate convictions when I was -- when was a senior assistant attorney in the Appeals Bureau, I -- yeah, I definitely had some cases from the '80s. And we still had -- we had to get them from archives, but -- but they still had the files.

THE COURT: Uh-huh. Okay.

All right. We've covered a lot of ground.

Is there anything else you would like to add, Mr. Schirripa, either to your arguments, or to any practical solutions that you seek to this whole situation?

MR. SCHIRRIPA: I think I've addressed the practical solutions. I do believe some of these documents are readily

accessible.

We're not talking about -- there was some database that we're not asking anyone, outside of their office. Under agency principle, if you're an attorney, you're working in an office.

My secretary or paralegal is going to create a photograph copy for me of the document. That falls within most protective orders as an accessible, use the document for the litigation of the case, and wouldn't violate the protective order.

So this idea that someone that's working for their agency is going to see this document as part of the collection process and that somehow violates the confidentiality agreement, it would be contrary to how litigation actually works.

MS. CORSI: I don't think I was saying that it violates the confidentiality stip, I'm just saying it expands the number of people who have access to it, and it's not just us.

THE COURT: I understood your argument to be more on the privacy point --

MS. CORSI: Yes.

THE COURT: -- than the confidentiality order.

MS. CORSI: Yes.

MR. CARROLL: Your Honor, I don't want to speak for

the record, but the retention policy is to keep those things. Obviously, because they are paper files, every once in a while we have a situation where we try to find a file, because it either got misfiled, misplaced, destroyed.

I mean, we lost an evidence warehouse -- well, that was actually an NYPD warehouse.

(Indiscernible).

THE COURT: I had to sign off on the destruction of multiple wiretaps, because they were moldy.

MR. CARROLL: Yes.

MR. SIDER: Just one more thing about the internal (indiscernible). We don't know if the screening sheet would be in the case -- depending what year we're talking about, I mean I'm sure the closer we are to 2026, the cases, 2026, more likely the screen sheet would be in the case management, but we wouldn't know until we physically looked.

THE COURT: Understood. Understood. Okay.

Not everyone at the same time.

Mr. Baylet?

MR. BAYLET: I'm having a little trouble understanding one thing. I've been listening to everyone saying about the labor intensity of all of this search.

I just don't understand how it was done just a couple of years ago, and all of a sudden now it's disappeared.

THE COURT: Mr. Baylet, we've covered that. You

guys are free to speak about that further another time, but not right now. This is not an opportunity for you to have a conversation.

Is there anything else for me, Mr. Baylet?

MR. BAYLET: No.

THE COURT: Mr. Schirripa?

MR. SCHIRRIPA: No, thank you, Your Honor.

THE COURT: Ms. Corsi, anything else?

MS. CORSI: No. Thank you.

THE COURT: Mr. Carroll?

MR. CARROLL: No, Your Honor.

THE COURT: Mr. Sider?

MR. SIDER: No.

THE COURT: Gook luck with your new job.

Where are you going?

MR. SIDER: I'm going to a small real estate firm.

THE COURT: Oh, interesting. Okay. That's a big change. Well, good luck to you. Hope it works out well.

All right, nice to meet you both.

Thank you all for being here. Nice to see you guys in person.

MS. CORSI: Thank you.

THE COURT: May I keep these, Mr. Schirripa, the samples from Judge Carter?

MR. SCHIRRIPA: Yes.

THE COURT: Okay.

Documents 55, 56 and 63 from the public docket.

MS. CORSI: 55, 56, and did you say?

THE COURT: 63 --

MS. CORSI: Okay.

THE COURT: -- from 24-CV-7212 in Southern.

MS. CORSI: Thank you.

MR. SCHIRRIPA: Thank you, Your Honor.

THE COURT: Thank you.

MR. SCHIRRIPA: Have a good afternoon.

THE COURT: You, too.

* * * * *

I certify that the foregoing is an accurate transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

s/ Linda D. Danelczyk June 16, 2026

LINDA D. DANELCZYK DATE